IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cr-410 |
| | ) | |
| | ) | |
| SEITU SULAYMAN KOKAYI, | ) | Hearing Date: 1/17/19 |
| | ) | |
| Defendant. | ) | The Honorable Leonie M. Brinkema |

## DEFENDANT'S MOTION, WITH MEMORANDUM, TO SUPPRESS ELECTRONIC SURVEILLANCE OBTAINED WITHOUT A WARRANT AND WITHOUT A FINDING OF PROBABLE CAUSE OF CRIMINAL CONDUCT, AND FOR DISCLOSURE OF THE FISA APPLICATIONS TO DEFENSE COUNSEL

COMES NOW the defendant, Seitu Kokayi, by counsel, hereby moves this Court: (1) to suppress all evidence and interceptions made and electronic surveillance and physical searches conducted pursuant to the Foreign Intelligence Surveillance Act (hereinafter ōFISAö), 50 U.S.C. §1801, et seq., and any fruits thereof, because the FISA surveillance was obtained and conducted in violation of FISA and the First and Fourth Amendments to the U.S. Constitution, and (2) for disclosure of the underlying applications for FISA warrants.

As an initial matter, disclosure of the FISA applications to defense counsel is an essential prerequisite to an accurate determination of the legality of the FISA surveillance and due process in this case. Otherwise the defense will be unable to adequately represent the defendants, and the Court will not have the benefit of the defense perspective on the key issues related to determining whether the FISA surveillance was lawful.

## STATEMENT OF FACTS

Seitu Kokayi, who was born in the United States and has lived here all his life (when he was younger, he attended the equivalent of boarding school, nine months per year for three years, in

Canada), is charged in a three count indictment with two counts of using a facility or means of interstate commerce to knowingly and unlawfully persuade, induce, entice or coerce and attempt to persuade, induce, entice or coerce a minor to engage in unlawful sexual activity in violation of Title 18, United States Code, Section 2422(b), and one count of transferring obscene materials to a minor, in violation of Title 18, United States Code, Section 1470.

Upon information and belief, the United States of America obtained a FISA warrant against Seitu Kokayi some time in 2015. Upon information and belief, the surveillance of Mr. Kokayi revealed no illegal activity until August 2018, but the FISA warrant was nevertheless apparently renewed every 90 days as required by law (50 U.S.C. §1805 (d)(1)).

The government alleges that from on or about August 2, 2018, and continuing through August 22, 2018, Mr. Kokayi, who is 29 years old, communicated with a 15 year old girl by use of cell phone, text messaging, and the internet application FaceTime, which is a video and audio communication application for iPhones. It is further alleged that Mr. Kokayi and the girl spoke with each other daily at various times of the day and night between August 2, 2018 and August 22, 2018, while the defendant was at his home in Fairfax, Virginia and the girl was outside of the Commonwealth of Virginia.

It is also alleged that in some of the conversations, Mr. Kokayi asked the girl to show her exposed breasts and to masturbate in front of the camera on her phone and to transmit that live visual depiction to him via FaceTime, and that Mr. Kokayi masturbated during a FaceTime communications with the girl. The government further alleges that during some of these FaceTime communications Mr. Kokayi directed the girl to "keep the lights on" or asking that they FaceTime while each was unclothed and bathing in a shower, and that on one occasion, Mr. Kokayi engaged in a FaceTime conversation while he was in the shower.

The government also alleges that on August 11, 2018, Mr. Kokayi questioned the girl about her genitalia and personal hygiene during a phone conversation.

There are no allegations in the indictment that Mr. Kokayi engaged in any activates related to terrorism.

# ARGUMENT

On November 9, 2018, the government filed a notice stating that it intends to offer into evidence õinformation obtained or derived from electronic surveillance and physical search pursuant to [FISA],ö and discovery has revealed extensive products of surveillance pursuant to FISA.

As detailed below, the interceptions and messages the government obtained pursuant to FISA should be suppressed because the surveillance and collection were conducted in violation of FISA, and of the First and Fourth Amendments. However, because defense counsel have not been provided with the underlying applications for the pertinent FISA warrants, this motion can only outline the possible bases for suppression for the Court to examine and consider.

## A. Background

FISA, 50 U.S.C. §1801, et seq., was enacted in 1978 in the wake of domestic surveillance abuses by federal law enforcement agencies as catalogued in Congressional Committee and Presidential Commission Reports.[1] The statute was designed to provide a codified framework for foreign intelligence gathering within the confines of the United States in response to civil liberties concerns and the gap in the law noted by the Supreme Court in *United States v. United States District Court (Keith, J.)*, 407 U.S. 297, 308-09 (1972).

---

[1] *See, e.g.,* FINAL REPORT OF THE SELECT COMMITTEE TO STUDY GOVERNMENTAL OPERATIONS WITH RESPECT TO INTELLIGENCE ACTIVITIES, S. Rep. No. 94-755, 94th Cong., 2d Sess. (1976); *Commission on CIA Activities Within the United States*, Report to the President (1975) (commonly referred to as the õRockefeller Commission Reportö). *See also United States v. Belfield*, 692 F.2d 141, 145 (D.C. Cir. 1982) (õ[r]esponding to post-Watergate concerns about the Executiveøs use of warrantless electronic surveillance, Congress, with the support of the Justice Department, acted in 1978 to establish a regularized procedure for use in the foreign intelligence and counterintelligence fieldö).

Through FISA, Congress attempted to limit the ability of the Executive Branch to engage in abusive or politically-motivated surveillance. FISA constituted Congress' attempt to balance the "competing demands of the President's constitutional powers to gather intelligence deemed necessary to the security of the Nation, and the requirements of the Fourth Amendment." H.R. Rep. No. 95-1283, at 15. FISA's provisions therefore represented a compromise between civil libertarians seeking preservation of Fourth Amendment and privacy rights, and law enforcement agencies citing the need for monitoring agents of a foreign power operating in the United States. *See In re Kevork*, 788 F.2d 566, 569 (9th Cir. 1986) (FISA "was enacted in 1978 to establish procedures for the use of electronic surveillance in gathering foreign intelligence information. . . . The Act was intended to strike a sound balance between the need for such surveillance and the protection of civil liberties") (quotation omitted).

Important differences exist between the standards for a FISA warrant and that issued under the Fourth Amendment or Title III of the U.S. Criminal Code. The "probable cause" required under FISA is merely that the target qualifies as an "agent of a foreign power," 50 U.S.C. § 1801(b), who will use the electronic device subject to electronic surveillance, or owns, possesses, uses, or is in the premises to be searched, *see* 50 U.S.C. §§ 1805(a)(3) & 1824(a)(3), and not that a crime has been, or is being, committed.

In that context, FISA establishes procedures for surveillance of foreign intelligence targets, whereby a federal officer acting through the Attorney General may obtain judicial approval for conducting electronic surveillance for foreign intelligence purposes. The FISA statute created a special FISA Court – the Foreign Intelligence Surveillance Court (hereinafter "FISC") – to which the Attorney General must apply for orders approving electronic surveillance of a foreign power, or an agent of a foreign power, for the purpose of obtaining foreign intelligence information. *See* 50 U.S.C. §§ 1802(b), 1803 & 1804. In addition, the Attorney General must review the application and determine whether it satisfies the criteria and requirements set forth in FISA. § 1804(d); *see also* § 1805(a)(1).

Regarding the judicial component of the FISA process, in considering an application for electronic surveillance pursuant to FISA, the Court should reject the application unless the application meets the following criteria sufficient to permit the Court to make the requisite findings under §1805(a):

(i) that the application was made by a federal officer and approved by the Attorney General;

(ii) that there exists probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power . . . and . . . each of the facilities or places at which the electronic surveillance is directed is being used or is about to be used by a foreign power or agent of a foreign power[;]"

(iii) that the proposed minimization procedures meet the definition of minimization procedures under §1801(h); and

(iv) that the application contains all required statements and certifications.

Also, in accordance with §1805(a)(4), if a target is a "United States person," the FISC must determine whether the "certifications" under §1804(a)(6)(E) – namely that the information sought is "the type of foreign intelligence information designated," and the information "cannot reasonably be obtained by normal investigative techniques" – are "not clearly erroneous." In addition, §1805(a)(2)(A) provides "that no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment . . ." FISA authorizes any "aggrieved person" to move to suppress evidence obtained or derived from an electronic surveillance on the grounds that "the information was unlawfully acquired" or "the surveillance was not made in conformity with an order of authorization or approval." §§ 1806(e)(1) & (2); 1825(f). FISA defines "aggrieved person" as "a person who is the target of electronic surveillance or any other person whose communications or activities were subject to electronic surveillance." § 1801(k).

In this instance, the aggrieved person, Mr. Kokayi, is a United States citizen, so the First Amendment protections apply.

FISA also permits evidence generated in intelligence investigations to be used in criminal

prosecutions. §§ 1806(b) & 1825(c). However, if a significant purpose of the surveillance is not to obtain foreign intelligence information but rather for the purpose of a criminal investigation, obtaining that evidence without complying with the Fourth Amendment violates the Constitution. *See* § 1804(a)(6)(B).

### B. Challenges to the Admissibility of FISA-Generated Evidence

Because Mr. Kokayi has been notified that his communications and property have been the subject of FISA surveillance and searches, he is an "aggrieved person" under § 1806(k). Nonetheless, defense counsel in this case have not been provided with the FISA applications that resulted in the surveillance and searches at issue.

While aggrieved criminal defendants can move to suppress FISA-generated evidence, §1806(f) provides that if the Attorney General files an affidavit that "disclosure or an adversary hearing would harm the national security of the United States," the court deciding the motion must consider the application and order for electronic surveillance *in camera* to determine whether the surveillance was conducted lawfully. Accordingly, FISA "requires the judge to review the FISA materials *ex parte in camera* in *every* case" to "decide whether any of those materials must be disclosed to defense counsel." *United States v. Daoud*, 755 F.3d 479, 482 (7th Cir. 2014).

The statute also adds that, "[i]n making this determination, the court may disclose to the aggrieved person, under appropriate security procedures and protective orders, portions of the application, order, or other materials relating to the surveillance only where such disclosure is necessary to make an accurate determination of the legality of the surveillance." 50 U.S.C. § 1806(f). Alternatively, § 1806(g) provides that "[i]f the court determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person except to the extent that due process requires discovery or disclosure."

The lack of access to the underlying FISA applications presents a significant impediment to

asserting a challenge to FISA surveillance with particularity. As the Fourth Circuit has recognized in an analogous context, the burden to be specific with respect to the basis for suppression must be relaxed when the information supporting the motion is held uniquely by the government. *Cf. United States v. Moussaoui*, 382 F.3d 453, 472 (4th Cir. 2004), *citing United States v. Valenzuela-Bernal*, 458 U.S. 858, 870-71, 873 (1982).

**1.** ***Grounds Upon Which the FISA Applications May Fail to Establish the Requisite Probable Cause***

**a.** ***The Elements of Probable Cause Under FISA***

Before authorizing FISA surveillance, the FISA Court must find, *inter alia*, probable cause to believe that "the target of the electronic surveillance is a foreign power or an agent of a foreign power." §1805(a)(2)(A). The Supreme Court has reiterated the long-standing rule that criminal probable cause requires "a reasonable ground for belief of guilt," and that "the belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). Under FISA, though, unlike with respect to a traditional warrant, the probable cause standard is directed *not* at the target's alleged commission of a crime, but at the target's alleged status as "a foreign power or an agent of a foreign power."

**b.** ***The "Agent of a Foreign Power" Requirement***

Consequently, this Court must initially determine, with respect to each application for FISA electronic surveillance of Mr. Kokayi, whether the application established a reasonable, particularized ground for belief that the defendant qualified as an agent of a foreign power. §§1805(a)(2)(A) & 1801(b)(2)(C) & (E).

Here, absent an opportunity to review the applications for any of the surveillance at issue, defense counsel cannot specify whether the allegations asserting that the defendants were an "agent of a foreign power" were sufficient to satisfy FISA. Among FISA's definitions of "agent of a foreign power," §1801(b)(2)(C) provides that the term includes: "any person . . . who *knowingly* engages in

sabotage or international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power." (Emphasis added).

If that provision was, in fact, the basis for the FISA applications, the statute requires the presentation of evidence establishing probable cause that the defendant or the relevant third-party target *knowingly* engaged in some type of international terrorism, and that the defendants *knew* that their activities were assisting "international terrorism."

In addition, because Mr. Kokayi is a United States citizen, if the activities relied upon by the government for the FISA warrant are protected speech under the First Amendment to the United States Constitution, Mr. Kokayi cannot be considered a foreign power or an agent of a foreign power. *See* 50 U.S.C. §1805(a)(2)(A) ("no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment to the Constitution of the United States").

### c. The Nature and Origins of the Information In the FISA Applications

Again, unlike the case with traditional warrants, non-disclosure of the FISA applications denies the defense the ability to contest the accuracy or reliability of the underlying information used to satisfy FISA's version of probable cause. As a result, absent such disclosure the defendants can request only that the Court review the FISA applications cognizant of certain factors and principles.

### i. The Limits of "Raw Intelligence"

First, foreign intelligence information is often in the form of "raw intelligence," and not vetted in the manner typical of information law enforcement agents supply in ordinary warrant applications, *i.e.*, that the information emanated from a source that was reliable and/or had a verifiable track record, or was independently corroborated. Such raw intelligence is often not attributed to *any* specific source, and its genesis can be multiple-level hearsay, rumor, surmise, and rank speculation. Also, the motivation driving sources of raw intelligence to impart information is usually not nearly as transparent as in conventional criminal justice circumstances. As a result, the dangers of deception and

disinformation are significantly enhanced.

Those limitations on the accuracy and reliability of raw intelligence are aggravated when the potential location and source of the information, in this case possibly believed to include Jamaica, reduce the possibility of meaningful corroboration or verification.

### ii. *Illegitimate and/or Illegal Sources of Information*

There is also the danger that the information in FISA applications, whether or not attributed to a particular source, was generated by illegal means such as warrantless wiretapping or constitutionally infirm FISA amendments that have yet to be challenged in criminal cases. In that context, the government should be compelled to disclose whether information in the FISA applications, or which was used to obtain information that appears in the applications, or was used in the investigation in this case in any fashion, originated from such illegitimate means. *Cf. Gelbard v. United States*, 408 U.S. 41 (1972) (in prosecution for contempt for refusal to testify, grand jury witness entitled to invoke as a defense statutory bar against use of evidence obtained via illegal wiretap as basis for questions in grand jury).

### (A) *The Warrantless Terrorist Surveillance Program*

For example, the government should be required to disclose whether any of the defendant's communications were intercepted pursuant to the Terrorist Surveillance Program (hereinafter "TSP"), a warrantless wiretapping program instituted in 2001. *But cf. United States v. Abu Ali*, 528 F.3d 210, 257 (4th Cir. 2008) (affirming district court's conclusion that disclosure of TSP was not warranted based on *ex parte* review of government justification). The government should further be compelled to disclose whether any communications intercepted pursuant to the TSP contributed to the FISA applications or the search warrant applications, or to the investigation of this case in any manner.

### (B) *Surveillance Pursuant to the FISA Amendments Act*

The Court should also examine whether any portion of the FISA electronic surveillance was requested and conducted pursuant to the authority provided in 50 U.S.C. §1881a, enacted in 2008 as

part of the FISA Amendments Act of 2008, Pub. L. No. 110-261 (2008), or whether any information in the FISA applications was the product of surveillance authorized under the FAA.

Congress amended FISA, effective Summer 2008, to allow for the collection of some electronic communications – ostensibly international in character, but which could include a domestic component (*i.e.*, one party within the United States) – without a traditional FISA warrant, but rather on advance court approval of targeting methods rather than designation of a particular target based on individualized probable cause. Those provisions, codified at 50 U.S.C. §1881a, raise constitutional issues different from those implicated by the pre-existing FISA provisions. The government should not have any legitimate interest in obscuring the authority pursuant to which it conducted FISA surveillance herein; indeed, refusal by the government to so disclose would deny the defendants a fair trial by depriving them of any meaningful opportunity to contest the acquisition and admissibility of evidence that may have been obtained unlawfully. Accordingly, the Court should examine the nature, genesis, and provenance of the information in the FISA application, and compel the government to disclose whether any such information was the product of warrantless electronic surveillance (either via the TSP or any other program), or of such surveillance authorized pursuant to the FAA (§1881a).

### d. *FISA's Prohibition On Basing Probable Cause Solely On a "United States Person's" Protected First Amendment Activity*

The statute includes an additional restriction for electronic surveillance of a "United States person," as it prohibits finding probable cause for such a target based solely upon First Amendment activities. In making that probable cause determination, the statute directs "[t]hat no United States person may be considered a foreign power or an agent of a foreign power solely upon the basis of activities protected by the first amendment . . ." §1805(a)(2)(A).

Accordingly, if the target participated in First Amendment activities such as expressing support, urging others to express support, gathering information, distributing information, raising money for political causes, or donating money for political causes, these activities cannot serve as a basis for

probable cause for a FISA warrant. The statute reaches only material support coordinated with or under the direction of a designated foreign terrorist organization. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 31-32 (2010) ("Independent advocacy that might be viewed as promoting the group's legitimacy is not covered.").

### 2. *The FISA Applications May Contain Intentional or Reckless Falsehoods or Omissions In Contravention of* Franks v. Delaware*, 438 U.S. 154 (1978)*

The Supreme Court's landmark decision in *Franks v. Delaware*, 438 U.S. 154 (1978), established the circumstances under which the target of a search may obtain an evidentiary hearing concerning the veracity of the information set forth in a search warrant affidavit. As the Court in *Franks* instructed, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statements necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* At 156-57.

The *Franks* opinion also sets a similar standard for suppression following the evidentiary hearing:

> in the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.*, at 156; *see United States v. Blackmon*, 273 F.3d 1204, 1208-10 (9th Cir. 2001) (applying *Franks* to Title III wiretap application); *United States v. Meling*, 47 F.3d 1546, 1553-56 (9th Cir. 1995) (same); *United States v. Duggan*, 743 F.2d 59, 77 n.6 (2d Cir. 1984) (suggesting that *Franks* applies to FISA applications under Fourth and Fifth Amendments). *See also United States v. Hammond*. 351 F.3d 765, 770-71 (6th Cir. 2003) (applying *Franks* principles).

The *Franks* principles apply to omissions as well as to false statements. *See*, *e.g., United States*

*v. Carpenter,* 360 F.3d 591, 596-97 (6th Cir. 2004); *United States v. Atkin*, 107 F.3d 1213, 1216-17 (6th Cir. 1997). Omissions will trigger suppression under *Franks* if they are deliberate or reckless, and if the search warrant affidavit, with omitted material added, would not have established probable cause.

As noted above, without the opportunity to review the applications, the defendants cannot point to or identify any specific false statements or material omissions in those applications. *See Daoud*, 755 F.3d at 493 (Rovner, J., concurring) (explaining difficulty of reconciling *Franks* with denying access to FISA warrant applications, and concluding that "[w]ithout access to the FISA application, it is doubtful that a defendant could ever make a preliminary showing sufficient to trigger a *Franks* hearing.").

Although that lack of access prevents defense counsel from making the showing that *Franks* ordinarily requires, counsel notes that the possibility that the government has submitted FISA applications with intentionally or recklessly false statements or material omissions is hardly speculative. For instance, in 2002, in *In re All Matters Submitted to the Foreign Intelligence Surveillance Court*, 218 F. Supp. 2d 611, 620-21 (FISC), *rev'd on other grounds sub nom.*, *In re Sealed Case*, 310 F.3d 717 (FISCR 2002)[2], the FISC reported that beginning in March 2000, the Department of Justice (hereinafter "DoJ") had come "forward to confess error in some 75 FISA applications related to major terrorist attacks directed against the United States. The errors related to misstatements and omissions of material facts," including:

- "75 FISA applications related to major terrorist attacks directed against the United States" contained "misstatements and omissions of material facts." 218 F. Supp. 2d at 620-21;

- the government's failure to apprise the FISC of the existence and/or status of criminal investigations of the target(s) of FISA surveillance; and

- improper contacts between criminal and intelligence investigators with respect to certain FISA applications. *Id.*

---

[2] "FISCR" refers to the Foreign Intelligence Court of Review, which is the appellate court for the FISC, and is comprised of three federal Circuit judges. The FISCR's 2002 decision in *In re Sealed Case* marked its first case since enactment of FISA in 1978.

According to the FISC, õ[i]n March of 2001, the government reported similar misstatements in another series of FISA applications . . .ö *Id.* at 621. Nor were those problems isolated or resolved by those revelations. A report issued March 8, 2006 by the DoJ Inspector General stated that the FBI found apparent violations of its own wiretapping and other intelligence-gathering procedures more than 100 times in the preceding two years, and problems appear to have grown more frequent in some crucial respects. *See* Report to Congress on Implementation of Section 1001 of the USA PATRIOT Act, March 8, 2006. The report characterized some violations as õsignificant,ö including wiretaps that were much broader in scope than authorized by a court (õover-collectionö), and others that continued for weeks and months longer than authorized (õoverrunsö). *Id.* at 24-25. FISA-related overcollection violations constituted 69% of the reported violations in 2005, an increase from 48% in 2004. *See* DoJ IG Report, at 29. The total percentage of FISA-related violations rose from 71% to 78% from 2004 to 2005, *id.* at 29, although the amount of time õover-collectionö and õoverrunsö were permitted to continue before the violations were recognized or corrected decreased from 2004 to 2005. *Id.* at 25.

Thus, a *Franks* hearing, and disclosure of the underlying FISA materials, are necessary in order to permit the defendant the opportunity to prove that the affiants before the FISC intentionally or recklessly made materially false statements and omitted material information from the FISA applications.

### 3. *The Collection of Foreign Intelligence Information May Not Be a Significant Purpose of the FISA Surveillance*

If the investigation, and purpose of the FISA surveillance, was criminal in nature, all of the evidence derived from the FISA surveillance of the defendants should be suppressed because the applications failed to adhere to FISAøs requirements, or in the alternative to seek appropriate authority under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. 99 2510-2520 (1982), rather than under FISA.

### 4. *The FISA Applications May Not Have Included the Required Certifications*

The Court should review the FISA applications to determine whether they contain all certifications required by §1804(a)(6). As the Ninth Circuit has declared in the Title III context, "[t]he procedural steps provided in the Act require –strict adherence," and "utmost scrutiny must be exercised to determine whether wiretap orders conform to [the statutory requirement]." *Blackmon*, 273 F.3d at 1207, *quoting United States v. Kalustian*, 529 F.2d 585, 588-9 (9th Cir. 1975).

In addition, the Court should examine two certifications with particular care – (i) that the information sought is "the type of foreign intelligence information designated," and (ii) that the information "cannot reasonably be obtained by normal investigative techniques." *See* §1804(a)(6)(E). Particularly if the target of the wiretap is a "United States person" (such as the defendant), these two certifications must be measured by the "clearly erroneous" standard. *See* §1805(a)(4).

As the Ninth Circuit has observed in relation to the similar provision in Title III, 18 U.S.C. § 2518(1)(e), "the necessity requirement –exists in order to limit the use of wiretaps, which are highly intrusive." *Blackmon*, 273 F.3d at 1207, *quoting United States v. Bennett*, 219 F.3d 1117, 1121 (9th Cir. 2000) (internal quotation omitted). The necessity requirement "ensure[s] that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the [information sought]." *Id.*

The Court should also carefully examine the dates, in sequence, of all FISA orders in this case to determine whether there were any lapses of time during which wiretapping continued. The statutory scheme contemplates that when a FISA order expires and the government wishes to continue the wiretap, the expiring order must be replaced by an extension order, which, in turn, may be obtained only on the basis of a proper FISA application. *See* §1805(d)(1) & (2). FISA surveillance that continues past the expiration date of the FISA order that originally authorized it is just as unauthorized as a wiretap that is initiated without any FISA order at all. Should the Court order the government to disclose the FISA orders in this case to defense counsel, the defense will be able to assist the Court in matching up all of the FISA orders by date.

**5.** *The FISA Applications, and the FISA Surveillance, May Not Have Contained or Implemented the Requisite Minimization Procedures*

In order to obtain a valid FISA order, the government must include in its application a "statement of the proposed minimization procedures." §1804(a)(4). The purpose of these minimization procedures is to (i) ensure that surveillance is reasonably designed to minimize the acquisition and retention of private information regarding people who are being wiretapped; (ii) prevent dissemination of non-foreign intelligence information; and (iii) prevent the disclosure, use, or retention of information for longer than seventy-two hours unless a longer period is approved by Court order. §1801(h).

FISA surveillance involves particularly intrusive electronic surveillance. Indeed, it typically occurs on a continuance 24-hour basis, as the Title III principle of "pertinence" is not applicable. Instead, *all* conversations are captured, with minimization occurring later and in other forms. Accordingly, minimization in the FISA context is critically important. One court has reasoned that in FISA the privacy rights of individuals are ensured not through mandatory disclosure of FISA applications, but

> through its provisions for in-depth oversight of FISA surveillance *by all three branches of government* and by a statutory scheme that to a large degree centers on *an expanded conception of minimization* that differs from that which governs law-enforcement surveillance.

*United States v. Belfield*, 692 F.2d 141, 148 & n. 34 (D.C. Cir. 1982) (footnote omitted), *quoting* Schwartz, *Oversight of Minimization Compliance Under the Foreign Intelligence Surveillance Act: How the Watchdogs are Doing Their Job*, 12 RUTGERS L.J. 405, 408 (1981) (emphasis added).

Here, the government has provided an incredibly large amount of products of surveillance. It is possible that the FISA application did not contain adequate minimization procedures or, if it did, that those procedures were not followed. In order to determine whether there were adequate minimization procedures, and that the government complied therewith, defense counsel must be provided with the FISA applications, orders, and related materials.

**C. *The Underlying FISA Applications and Other Materials Should Be Disclosed to Defense Counsel to Enable Them to Assist the Court, and On Due Process Grounds***

**1. *Disclosure of FISA Materials to the Defense Pursuant to §1806(f)***

According to FISA's legislative history, disclosure may be "necessary" under §1806(f) "where the court's initial review of the application, order, and fruits of the surveillance indicates that the question of legality may be complicated by factors such as ...indications of possible misrepresentation of fact, vague identification of the persons to be surveilled, or surveillance records which include a significant amount of nonforeign intelligence information, calling into question compliance with the minimization standards contained in the order." *United States v. Belfield*, 692 F.2d 141, 147 (D.C. Cir. 1982) [*quoting* S. Rep. No. 701, 95th Cong., 2d Sess. 64 (1979)]; *see, e.g.*, *United States v. Ott*, 827 F.2d 473, 476 (9th Cir. 1987) (same); *United States v. Duggan*, 743 F.2d 59, 78 (2d Cir. 1984) (same).

There are ample justifications for disclosure of the FISA applications in this case which would permit defense counsel an opportunity to demonstrate that the requisite probable cause with respect to the issue of knowledge was lacking, that with respect to the defendant, "United States person[s]," the alleged "activities" fell within the protection of the First Amendment and, thus, could not be used as a basis for probable cause in any event, and that the information in the applications was either unreliable or obtained via illegal means. Disclosure would also afford defense counsel an opportunity to identify procedural irregularities.

In addition, the Court could issue an appropriate Protective Order that would provide elaborate protection for any classified information, and which would permit such materials to be disclosed to defense counsel but not to the defendants. *See* Classified Information Procedures Act (hereinafter "CIPA"), 18 U.S.C. App. III, at §3.

Thus, while no court in the history of FISA has ordered disclosure of FISA applications, orders, or related materials, *see, e.g., In re Grand Jury Proceedings*, 347 F.3d 197, 203 (7th Cir. 2003) (citing cases); *United States v. Sattar*, 2003 U.S. Dist. LEXIS 16164, at *19 (S.D.N.Y. Sept. 15, 2003) (same),

disclosure should occur in this case. Indeed, the existence of §1806(f) is an unambiguous declaration that Congress intended for courts to grant disclosure in appropriate cases. If §1806(f) is to be rendered meaningful at all, and not be rendered superfluous and entirely inert, it should apply in this case.

### 2. *Disclosure of FISA Materials to the Defense Pursuant to §1806(g)*

Even if the Court were to decline to find that disclosure of FISA-related materials to the defense is appropriate under §1806(f), the defense would still be entitled to disclosure of the FISA applications, orders, and related materials under §1806(g), which expressly incorporates the Fifth Amendment Due Process Clause, and provides that õ[i]f the court determines that the surveillance was lawfully authorized and conducted, it shall deny the motion of the aggrieved person *except to the extent that due process requires discovery or disclosure*.ö 50 U.S.C. §1806(g) (emphasis added). *See also United States v. Spanjol*, 720 F. Supp. 55, 57 (E.D. Pa. 1989) (õ[u]nder FISA, defendants are permitted discovery of materials only to the extent required by due process. That has been interpreted as requiring production of materials mandated by [*Brady*], essentially exculpatory materialsö).

### 3. Ex Parte *Proceedings To Address this Motion Are Antithetical to the Adversary System of Justice*

Lack of disclosure would render the proceedings on the validity of the FISA electronic surveillance *ex parte*, as the challenges on the defendantøs behalf would be made without access to documents and information essential to the determination of his motion. Such proceedings are antithetical to the adversary system that is the hallmark of American criminal justice.

As an initial matter, the adversary nature of our system of criminal justice warrants participation by the defense in the actual conversation regarding the legality of surveillance used to prosecute the defendants. Indeed, õArticle III of the Constitution limits federal-court jurisdiction to ‒Casesøand ‒Controversies.øThose two words confine ‒the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process.øö *Massachusetts v. E.P.A.*, 549 U.S. 497, 516 (2007) (quoting *Flast v. Cohen*, 392 U.S. 83, 95

(1968)). Although proceedings to obtain judicial authorization for searches and surveillance by law enforcement are an exception to this rule, challenges to such proceedings and the resulting searches and surveillance are not. Moreover, as the Supreme Court has recognized, "[f]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights. . . . No better instrument has been devised for arriving at truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *United States v. James Daniel Good Real Property, et. al.*, 510 U.S. 43, at 55 (1993) (*quoting Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 170-72 (1951) (Frankfurter, J., *concurring*). *See also United States v. Madori*, 419 F.3d 159, 171 (2d Cir. 2005), *citing United States v. Arroyo-Angulo*, 580 F.2d at 1145 (closed proceedings "are fraught with the potential of abuse and, absent compelling necessity, must be avoided") (other citations omitted).[3]

Indeed, "[f]or more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.'" *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (*quoting Baldwin v. Hale*, 1 Wall. 223, 233, 17 L.Ed. 531 (1864)).

In *United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004), the Second Circuit reemphasized the importance of open, adversary proceedings, declaring that "[p]articularly where liberty is at stake, due process demands that the individual and the government each be afforded the opportunity not only to advance their respective positions but to correct or contradict arguments or evidence offered by the other." 389 F.3d at 322-23 (*citing McGrath*, 341 U.S. at 171 n. 17 (Frankfurter, J., *concurring*)), which noted that "the duty lying upon every one who decides anything to act in good faith and fairly listen to both sides . . . always giving a fair opportunity to those who are parties in the controversy for correcting or contradicting any relevant statement prejudicial to their view") (citation and internal quotation marks

---

[3] Conversely, as Judge Learned Hand said in *United States v. Coplon*, 185 F.2d 629, 638 (2d Cir. 1950), *cert. denied*, 342 U.S. 920 (1952), "[f]ew weapons in the arsenal of freedom are more useful than the power to compel a government to disclose the evidence on which is seeks to forfeit the liberty of its citizens."

omitted).

As the Ninth Circuit observed in the closely analogous context of a secret evidence case, "[o]ne would be hard pressed to design a procedure more likely to result in erroneous deprivations. . . . [T]he very foundation of the adversary process assumes that use of undisclosed information will violate due process because of the risk of error." *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045, 1069 (9th Cir. 1995) (*quoting* District Court); *see, e.g., id*. at 1070 (noting "enormous risk of error" in use of secret evidence).

Similarly, in the Fourth Amendment context, including in relationship to electronic surveillance, the Supreme Court has twice rejected the use of *ex parte* proceedings on grounds that apply equally here. In *Alderman v. United States*, 394 U.S. 165 (1969), the Court addressed the procedures to be followed in determining whether government eavesdropping in violation of the Fourth Amendment contributed to the prosecution case against the defendants. The Court rejected the government's suggestion that the district court make that determination *in camera* and/or *ex parte*.

The Court observed that

> [a]n apparently innocent phrase, a chance remark, a reference to what appears to be a neutral person or event, the identity of a caller or the individual on the other end of a telephone, or even the manner of speaking or using words may have special significance to one who knows the more intimate facts of an accused's life. And yet that information may be wholly colorless and devoid of meaning to one less well acquainted with all relevant circumstances.

*Id*. at 182.

In ordering disclosure of improperly recorded conversations, the Court declared: "[a]dversary proceedings will not magically eliminate all error, but they will substantially reduce its incidence by guarding against the possibility that the trial judge, through lack of time or unfamiliarity with the information contained in and suggested by the materials, will be unable to provide the scrutiny that the Fourth Amendment exclusionary rule demands." *Id*. at 184.

Likewise, the Court held in *Franks v. Delaware*, 438 U.S. 154 (1978), that a defendant, upon a

preliminary showing of an intentional or reckless material falsehood in an affidavit underlying a search warrant, must be permitted to attack the veracity of that affidavit. The Court rested its decision in significant part on the inherent inadequacies of the *ex parte* nature of the procedure for issuing a search warrant, and the contrasting enhanced value of adversarial proceedings:

> the hearing before the magistrate [when the warrant is issued] not always will suffice to discourage lawless or reckless misconduct. The pre-search proceeding is necessarily *ex parte*, since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove evidence. The usual reliance of our legal system on adversary proceedings itself should be an indication that an *ex parte* inquiry is likely to be less vigorous. The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations. The pre-search proceeding will frequently be marked by haste, because of the understandable desire to act before the evidence disappears; this urgency will not always permit the magistrate to make an independent examination of the affiant or other witnesses.

438 U.S. at 169.

The same considerations that the Supreme Court found compelling in *Alderman* and *Franks* militate against *ex parte* procedures in the FISA context. Indeed, the lack of any authentic adversary proceedings in FISA litigation more than likely accounts for the government's perfect record in defending FISA and FISA-generated evidence. After all, denying an adversary access to the facts constitutes an advantage as powerful and insurmountable as exists in litigation.

As the FISC itself has acknowledged, for example, without adversarial proceedings, systematic executive branch misconduct – including submission of FISA applications with "erroneous statements" and "omissions of material facts" – went entirely undetected by the courts until the FISC directed that the Department of Justice review FISA applications and submit a report to the FISC. *See In re All Matters Submitted to the Foreign Intelligence Surveillance Court*, 218 F. Supp.2d at 620-21, *rev'd on other grounds*, 310 F.3d 717 (FISCR 2002).

However, as discussed above, the complete deference now required of the courts toward the executive with respect to FISA renders any such "in-depth oversight" and "expanded conception of

minimization" entirely illusory. As a result, §§1806(f) & (g), and the disclosure they authorize, assume significantly greater meaning and importance in evaluating the validity of FISA applications. Also, as noted above, a protective order could be implemented, thereby further eliminating any justification for non-disclosure, or any claim that such limited, safe disclosure presents any danger to national security. Moreover, the Court's review *in camera* is not a substitute for defense counsel's participation. As the Supreme Court recognized in *Alderman*, "[i]n our adversary system, it is enough for judges to judge. The determination of what may be useful to the defense can properly and effectively be made only by an advocate." 394 U.S. at 184; *see also Franks v. Delaware*, 438 U.S. 154, 169 (1978) (permitting adversarial proceeding on showing of intentional falsehood in warrant affidavit because the magistrate who approves a warrant *ex parte* "has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations").

Accordingly, either under §1806(f), §1806(g), and/or the Due Process clause, disclosure of the FISA materials is authorized and appropriate in this case.

WHEREFORE, for the foregoing reasons, Seitu Kokayi respectfully requests that the Court suppress all information and evidence obtained pursuant to the FISA warrant in this case or the investigation which resulted from the information obtained pursuant to the FISA warrant.

Respectfully submitted,

SEITU SULAYMAN KOKAYI
By Counsel

_____/s/_____
Mark Petrovich
Va. Bar # 36255
Petrovich & Walsh, P.L.C.
10605 Judicial Drive, Suite A-5
Fairfax, Virginia 22030
(703) 934-9191 (tel)
(703) 934-1004 (fax)
mp@pw-lawfirm.com (email)

Anthony Nourse, Esquire
Va. Bar # 40335
4151 Chain Bridge Road
Fairfax, Virginia 22030
(703) 881-9161
(703) 881-9162 (fax)
ahn@fairfaxdefense.com

## CERTIFICATE OF SERVICE

I hereby certify that on or before the 17th day of December, 2018, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Kellen S. Dwyer, Esquire
Dennis M. Fitzpatrick, Esquire
Assistant United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
phone: 703 299-3816
fax:      703 299-3981
Kellen.Dwyer@usdoj.gov
Dennis.Fitzpatrick@usdoj.gov


_____/s/_____
Mark Petrovich
Virginia Bar No. 36255
Counsel for the Defendant
PETROVICH & WALSH, P.L.C.
10605 Judicial Drive, Suite A-5
Fairfax, Virginia 22030
Phone:  (703) 934-9191
Fax:  (703) 934-1004
mp@pw-lawfirm.com