IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:18-CR-410-LMB |
| | ) | |
| SEITU SULAYMAN KOKAYI, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by and through its attorneys G. Zachary Terwilliger, United

States Attorney, Kellen S. Dwyer and Dennis M. Fitzpatrick, Assistant United States Attorneys,

and Joseph Attias, Trial Attorney, United States Department of Justice, hereby files this response

to the Defendant's Motion to Suppress. For the reasons set forth in this Opposition, and based on

the evidence submitted therewith, including the written waiver of Kokayi's *Miranda* rights (Dkt.

42-1), and the transcript and video of Kokayi's interview, the United States respectfully requests

that the Court deny the Motion to Suppress.[1] Further, because the facts relevant to this dispute

were entirely captured on the video of the interview, and there are no disputes of material fact, the

United States respectfully submits that this motion can be resolved without an evidentiary hearing.

*See United States v. Roane*, 100 F. App'x 901, 902 (4th Cir. 2004) (upholding decision not to grant

a suppression hearing where there was no "genuine dispute of material facts"); *United States v.

Graham*, 73 F. App'x 588, 590 (4th Cir. 2003) (the decision to grant or deny a suppression hearing

is committed to the discretion of the district court).

---

[1] The government has filed the transcript and video of Kokayi's interview under seal, as Exhibits
A and B to its motion to seal. (Dkt. 50).

## INTRODUCTION

Seitu Sulayman Kokayi is a 29-year-old male employed in the Information Technology field who resides in Alexandria, Virginia.  Around early August 2018, the FBI became aware that Kokayi was having sexual conversations with an identified female minor (hereinafter Minor Female Victim or "MFV").  During these conversations, Kokayi discussed sexual topics with the child and expressed a romantic interest in her.  The two then discussed having sexual relations and appeared to discuss engaging in sexual activity over "FaceTime," Apple's video chat application. For a more thorough summary of these conversations, please see the Complaint affidavit filed in this case. (Dkt. 2).[2]  On August 22, 2018, a magistrate judge in this district signed a Criminal Complaint authorizing Kokayi's arrest for violating 18 U.S.C. § 2422(b) (Coercion and Enticement of a Minor).  (Dkt. 1).  Kokayi was arrested the next day without incident.  Upon arrest, Kokayi waived his *Miranda* rights and agreed to speak with Special Agents Clark and Brundage at the FBI's Washington Field Office ("WFO").  During the interview, Kokayi made numerous inculpatory statements, several of which are summarized below.

During his interview, Kokayi stated that he had recently communicated at least once a day with MFV, through phone calls, text messages, Instagram, and FaceTime video.  Kokayi stated that he and MFV liked each other more than just as friends and that in the past several weeks they had begun discussing sexual topics.  Kokayi stated that he now recognized this as a "humongous mistake."  Kokayi stated that this was the first time he had engaged a minor sexually and felt that

---

[2] The government notes that two portions of the complaint affidavit may contain errors. First, the affidavit references a conversation in which MFV states that she is about to shower and the Defendant responds by twice saying "B size." Compl. Aff. ¶ 37. The affiant stated that he believed this to be a reference to MFV's breasts. The FBI has since re-reviewed the recordings to create transcriptions for trial. Upon re-review, the FBI believes that the Defendant actually said "be fast," not "B size." Second, the complaint affidavit quotes the MFV as stating that in four years "I'll be a senior." Compl. Aff. ¶ 39. Upon re-review, it appears that she said "I'll be a first-year." Defense counsel has had copies of these recordings since entering the case in September.

it was a "mistake that happened," a "bad choice," and that he "accept[ed] it." Kokayi admitted that over the past few weeks he and MFV had sexual video chats over FaceTime and discussed having sexual relations.

On November 8, 2018, Kokayi was indicted in the Eastern District of Virginia on two counts of Coercion and Enticement of a Minor, in violation of 18 U.S.C. § 2422(b), and one count of Transfer of Obscene Material to a Minor, in violation of 18 U.S.C. § 1470. (Dkt. 29).

## ARGUMENT

As explained below, the record of the interview and the surrounding circumstances clearly demonstrate that Kokayi knowingly, intelligently, and voluntarily waived his *Miranda* rights and that his waiver was solely the product of his free will, as opposed to law-enforcement coercion. As such, Kokayi's Motion to Suppress should be denied.

**I.      THE DEFENDANT'S *MIRANDA* WAIVER WAS VOLUNTARY, INTELLIGENT, AND KNOWING.**

### A.  Legal Standard

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself. . . ." U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the United States Supreme Court held that a suspect in custody must be advised of his/her constitutional rights under the Fifth Amendment prior to any custodial interrogation.   Naturally, a suspect may waive his Fifth Amendment rights and voluntarily participate in a custodial interrogation.   *Miranda*, 384 U.S. at 444.   In such a circumstance, a suspect's waiver must be made "voluntarily, knowingly, and intelligently." *Id*. To be voluntary, the waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  To be

knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

Whether a suspect has voluntarily, knowingly, and intelligently waived his *Miranda* rights is assessed by the "totality of the circumstances surrounding the interrogation." *Burbine*, 475 U.S. at 421; *see also United States v. Robinson*, 404 F.3d 850, 860 (4th Cir. 2005). In considering the totality of the circumstances, the Fourth Circuit has directed courts to consider "the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of the *Miranda* warnings." *United States v. Dire*, 680 F.3d 446, 475 (4th Cir. 2012) (quoting *Correll v. Thompson*, 63 F.3d 1279, 1288 (4th Cir. 1995)). The Fourth Circuit has articulated a two-step inquiry to assess the adequacy of a suspect's *Miranda* waiver. *First*, a court must find "the relinquishment of the right '[was] voluntary in the sense that it was the product of free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Cristobal*, 293 F.3d 134, 139 (4th Cir. 2002) (quoting *Burbine*, 475 U.S. at 421). *Second*, the court must find the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

### 1. Voluntariness of a *Miranda* Waiver

The mere presence of some potentially coercive factors, either pre-existing, self-induced, or externally imposed, does not necessarily render a *Miranda* waiver involuntary. Indeed, the Fourth Circuit has rejected claims of involuntariness in a myriad of circumstances where the existence of some form of coercion, standing alone, was insufficient to render a *Miranda* waiver involuntary. *See, e.g.*, *United States v. Walker*, 607 F. App'x 247, 257 (4th Cir. 2015) (waiver voluntary despite roadside interview of handcuffed and intoxicated defendant); *Cristobal*, 293 F.3d at 141 (existence of pain insufficient to render waiver involuntary); *United*

*States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012) (fatigue from air-travel insufficient to render waiver involuntary); *Dire*, 680 F.3d at 470-75 (waiver valid despite defendants being handcuffed); *Robinson*, 404 F.3d at 861 (below average I.Q. and several mental disorders did not render defendant "per se incapable of intelligently waiving his rights"); *United States v. Hyman*, 91 F. App'x 265, 266 (4th Cir. 2004) (waiver valid despite defendant suffering pain from recent gunshot wound); *United States v. Smith*, 608 F.2d 1011, 1012-13 (4th Cir. 1979) (waiver valid despite defendant having "drunk enormous quantities of alcohol in the twenty-four hour period before the interview"); *cf. United States v. Seni*, 662 F.2d 277, 280 (4th Cir. 1981) (neither a draw gun nor handcuffs necessarily render a statement involuntary).

Ultimately, as the above-cited cases demonstrate, the voluntariness of a waiver depends on "the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Walker*, 607 F. App'x at 255 (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)); *Cristobal*, 293 F.3d at 141. A defendant's *Miranda* waiver "is deemed involuntary only if induced by such duress or coercion that the suspect's 'will has been overborne and his capacity for self-determination critically impaired.'" *Id.* (quoting *United States v. Locklear*, 829 F.2d 1314, 1317 (4th Cir. 1987)).

### 2.   Knowing and Intelligent *Miranda* Waiver

As noted above, to be knowing and intelligent, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421. The Fourth Circuit has held that to be knowing and intelligent, "it is not necessary that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Dire*, 680 F.3d at 475 (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)) (internal quotations omitted). In general, "the

knowingness of the waiver often turns on whether the defendant expressed an inability to understand the rights as they were recited." *Robinson*, 404 F.3d at 861; *Dire*, 680 F.3d at 472; *see also United States v. Khoa Dang Hoang*, 737 F. App'x 136, 138-39 (4th Cir. 2018) (rejecting argument that *Miranda* waiver was not knowing and intelligent because defendant had never been arrested before and feigned a lack of sophistication and familiarity with the American justice system).  As noted above, "[t]he determination of whether a waiver was knowing and intelligent requires an examination of the totality of the circumstances surrounding the interrogation, including the suspect's intelligence and education, age and familiarity with the criminal justice system, and the proximity of the waiver to the giving of the Miranda warnings." *Dire*, 680 F.3d at 475 (citation omitted).

### B.  Application

Kokayi levels a bevy of allegations at the FBI's conduct during the interview.  While Kokayi's motion does not appear to distinguish which claims fall into the "voluntariness" category and which fall into the "knowing and intelligent" category, the government will strive to respond to each in turn.  Ultimately, the Defendant's argument can be distilled as follows: Kokayi's *Miranda* waiver was either not voluntary, knowing, or intelligent, as evidenced by (1) his statement that he was "not okay" during the interview; (2) his allegedly unanswered pleas to know the nature of the charges against him; (3) his alleged lack of knowledge as to the process regarding requesting an attorney and his ability to withdraw his waiver once he began speaking; and (4) two periods of silence which Kokayi argues indicate "extreme hesitation and confusion."  Def. Mot. at 9.

Contrary to Kokayi's allegations, the facts and circumstances of this case plainly demonstrate that the Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights prior to speaking to the FBI Agents.  Kokayi is a 29-year-old English speaker and United

States citizen.  Kokayi earned a Bachelor's degree in Computer Science from the University of Maryland and, prior to his arrest, worked as a Content Developer, creating text, video, and graphic material for the University.  Trans. at 32.  On weekends, Kokayi volunteers as a Quran instructor to approximately fifty students of all ages.  Trans. at 10, 32, 44.

Prior to the interview, Kokayi received a bottle of water, hot chocolate, and a meatless sandwich (to conform to his religious dietary restrictions), and was told to feel free to eat, ask questions, and go to the restroom at any time.  Trans. at 2-3.  As evidenced by the video-recorded interview, Kokayi was interviewed without handcuffs in a spacious, well-lit room.  Kokayi appeared alert, healthy, and although understandably pensive, fully aware of the situation in which he had landed.  The Agents spoke slowly and softly, and never displayed weapons during the interview.  No Agent raised his voice or exhibited any intimidating behavior during the interview.  Kokayi also knew the interview was being recorded.  Trans. at 2.

Prior to reading from the Advice of Rights Form, Special Agent Brundage told Kokayi that they "work cases involving crimes against children" and that he was "arrested today on a charge for attempting to entice a minor to engage in sexual activity."  Trans. at 2.  Special Agent Brundage then read Kokayi the standard *Miranda* warning line-by-line, and Kokayi responded understandingly after each line was completed.  Trans. at 4.    Special Agent Brundage read the warning extremely slowly and looked up at Kokayi after each line.  Video Recording at 2:20-2:50.  Kokayi not only indicated understanding orally, Trans. at 4, but also through light nodding or facial expressions indicative of comprehension.   Video Recording at 2:20-2:50.   After hearing the completed warning, Kokayi smiled mildly, and soon after smiled again and partially laughed.  Video Recording at 3:08-3:22.  When Kokayi asked what would happen if he requested a lawyer, he was told "Then we don't ask you any questions."  Trans. at 6.  Finally, Kokayi was told that if

he waived his rights, he could still stop at any time and could also choose not to answer certain questions. Trans. at 4, 6-8.

As just noted, Special Agent Brundage recited the standard *Miranda* warning line-by-line and observed Kokayi respond understandingly after each line concluded. Trans. at 4. This is exactly what law enforcement agents are expected to do. *See United States v. Gatherum*, 338 F. App'x 271, 278 (4th Cir. 2009) ("the troopers informed Gatherum about the nature of his *Miranda* rights and the consequences of a decision to waive those rights, which is all that is required under *Moran*."). Nothing in the record suggests that Kokayi, a teacher with a degree in Computer Science, did not understand Special Agent Brundage's measured, line-by-line recitation of the *Miranda* warning. *See Robinson*, 404 F.3d at 861 ("nothing in the record indicates that Robinson could not understand the rights as Agent Hicks provided them. To the contrary, the record reveals [] that Robinson was 'street smart' and understood his *Miranda* rights."). Similarly, at no time during the interview did Kokayi "express[] an inability to understand the rights as they were recited." *Id*.; *see also Dire*, 680 F.3d at 472 ("At no point did Defendants claim that they did not understand the words [of the *Miranda* warning] being recited"); *United States v. Starner*, 620 F. App'x 156, 161 (4th Cir. 2015) (finding waiver voluntary where "police read Starner's *Miranda* rights aloud to him, and saw no indication that Starner did not comprehend their communications.").[3] Indeed, everything in the record, specifically, Special Agent Brundage's

---

[3] In fact, immediately after hearing the full advice of rights, Kokayi states: "I just don't know what to do. This is all just so surprising to me, so (sigh)." Trans. at 5. Far from indicating confusion as to the substance of the waiver, this acknowledgment clearly suggests that Kokayi understood he was faced with an important choice and that his decision carried consequences. Kokayi's occasionally pensive posture throughout the first ten minutes of the interview supports this point. So too, Kokayi's subsequent statement that "This is, this is all new to me. I don't, I really have no idea what to do, I don't, I don't even know, like, what am I looking at? Like what are the risks [OV] and what are the-," Trans. at 6, suggests that Kokayi understood that his decision was an important one and carried attendant consequences, even if he did not understand all the ramifications. *See Dire*, 680 F.3d at 475 ("it is not necessary that a criminal suspect know and

slow and clear rendering of the *Miranda* warning, coupled with Kokayi's indications of understanding, compels the opposite conclusion. *See United States v. Hunter*, 63 F. Supp. 3d 614, 625 (E.D. Va. 2014) (finding voluntary and knowing waiver where detective "repeatedly asked Defendant if Defendant understood his rights[] [and] Defendant responded in the affirmative each time."). In any event, even if there existed some lack of clarity on Kokayi's part, this fact alone would not render his waiver involuntary and unknowing. *See United States v. Tran*, 589 F. App'x 139, 141-42 (4th Cir. 2015) (*Miranda* waiver voluntary and knowing despite defendant asking, "What is silent?"; "What is a waiver?"; and, "Is that I don't have to talk to you and then you punish me?" where agents assured defendant she would not be punished for remaining silent and ultimately understood she did not have to speak to agents).

As is evident, nothing about Kokayi's responses, or the interview's surrounding circumstances, supports the claim that his *Miranda* waiver was involuntary or unknowing. Indeed, nowhere in Kokayi's Motion to Suppress does he specifically contend with the Fourth Circuit's "totality of the circumstances" inquiry. *See Dire*, 680 F.3d at 475 (listing a suspect's intelligence and education, age, familiarity with the criminal justice system, and the proximity of the waiver to the giving of the *Miranda* warnings as pertinent factors). Had he, this Court would see that not one single factor points in the direction of an involuntary and unknowing waiver.

To the contrary, Kokayi is an intelligent, 29-year-old teacher of religious studies with a Bachelor's degree in Computer Science, an exceedingly difficult major, from the University of Maryland. Kokayi puts his technical background to use daily in his employment with the University as a Content Developer. Trans. at 32. Kokayi has been teaching since he was fifteen

---

understand every possible consequence of a waiver of the Fifth Amendment privilege."). At any rate, it is not entirely clear that Kokayi's statement "what am I looking at?" refers to the Advice of Rights form placed before him on the table, as opposed to a question about, for example, his sentencing exposure, as in, "how much time am I looking at?"

or sixteen years old, Trans. at 74, and on weekends, manages a class of approximately fifty students of all ages.  Trans. at 10, 32, 44.  Kokayi also instructs students on Quran memorization and has memorized the Quran himself.  Trans. at 39, 74.

As to the proximity of the waiver to the giving of the *Miranda* warnings, *id.*, Kokayi was fully read the Advice of Rights in the second and third minutes of the interview, Video Recording at 2:21-3:03, and signed the Advice of Rights Form about seven minutes later.  Video Recording at 10:03. This fact not only points strongly in favor of a valid waiver, *see North Carolina v. Butler*, 441 U.S. 369, 373 (1979) ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver."); *cf. Berghuis v. Thompkins*, 560 U.S. 370, 386 (2010) (that defendant "made a statement about three hours after receiving a *Miranda* warning does not overcome the fact that he engaged in a course of conduct indicating waiver."), but also contradicts the Defendant's exaggerations that the FBI Agents "exerted a continuous and significant coercive pressure on Mr. Kokayi to get him to waive his rights."  Def. Mot. at 9.[4]  In fact, the recorded interview demonstrates that the Agents were exceedingly gentle towards Kokayi and the government respectfully encourages the Court to review the recorded interview to dispel any uncertainty caused by the transcript.  *See Tran*, 589 F. App'x at 141-42 (noting that defendant appeared from the interview transcript to have had difficulty understanding the agents but that the audio recording heard in its entirety "paints a different picture.").[5]

---

[4] Kokayi's assertion that there was a "10-15 minute deliberation period," Def. Mot. at 9, is also incorrect.  As noted above, Kokayi signed the Advice of Rights Form about ten minutes into the interview and about seven minutes after hearing the rights fully read.

[5] The final "totality of the circumstances" factor, the Defendant's familiarity with the criminal justice system, *Dire*, 680 F.3d at 475, appears to point in no direction in this case.  While the government does not believe the Defendant has any criminal record, it is aware that Kokayi was interviewed by Agents from the FBI, Customs and Border Protection, and Homeland Security

There is simply nothing in the record that suggests, let alone demonstrates, that Kokayi's waiver of rights was not "the product of free and deliberate choice." *Cristobal*, 293 F.3d at 139. For it to be otherwise, Kokayi would need to show some form of "intimidation, coercion, or deception." *Id.* Because he cannot make this showing, Kokayi alleges a combination of four factors, of which the confluence, according to the Defendant, "illustrate a complete lack of understanding of the entire circumstances into which he was forced," Def. Mot. at 9, thereby, presumably, rendering his waiver of rights involuntary or unknowing. Kokayi's allegations are either contradicted by the facts or simply foreclosed under the law.

Kokayi first avers that his statement that he was "not okay" illustrates the involuntary and unknowing nature of his waiver of rights. Def. Mot. at 9. As an initial matter, there is no evidence that Kokayi's statement meant anything other than that he was simply "not okay" after his conduct involving a minor had been unearthed.[6] Notwithstanding, as noted above, the mere presence of some potentially coercive factors does not necessarily render a *Miranda* waiver involuntary. As explained, the Fourth Circuit has found *Miranda* waivers voluntary in circumstances where defendants were far more debilitated than simply "not okay." For example, the Fourth Circuit has affirmed waivers of rights where defendants were handcuffed, intoxicated and interviewed on a roadside, *Walker*, 607 F. App'x at 257; in pain and on painkillers, *Cristobal*, 293 F.3d at 141; fatigued from air-travel, *Holmes*, 670 F.3d at 591; had a below average I.Q. and several mental disorders, *Robinson*, 404 F.3d at 861; in pain from recent gunshot wound, *Hyman*, 91 F. App'x at 266; and either intoxicated or recovering from heavy drinking, *Smith*, 608 F.2d at 1012-13.

---

Investigations in August 2017, upon returning to the United States from foreign travel. This appears to have been a voluntary, non-*Mirandized* interview.

[6] This point is buttressed by Kokayi's very next statement, which clearly indicates he had the pending charges on his mind: "So my house was raided because of me talking to a minor. Is that, is that what's happening?" Trans. at 5. Far from being evidence of Kokayi's mental or physical well-being, Kokayi's "not okay" statement was most likely just a reaction to his new reality.

Nothing even remotely approaching these scenarios is present in this case. To the contrary, Kokayi was interviewed without restraints in a spacious, well-lit room, provided with food and drink, and told to use the restroom at any time. *See Starner*, 620 F. App'x at 161 ("the totality of the circumstances does not indicate police coercion. Starner was offered access to the restroom, food and beverage, and was placed in handcuffs with his arms in front of him"). Kokayi was told he could ask questions and could stop at any time. Kokayi appeared alert, healthy, and generally responded directly to the Agents' questions. The Agents spoke slowly and softly to Kokayi and never displayed their weapons. Kokayi demonstrated comprehension during the reading of the *Miranda* rights, both orally and through gesture, and even lightly smiled upon their completion.

Most critically, despite Kokayi's one-time statement that he was "not okay," he never asked not to be interviewed due to any malady from which he allegedly suffered. *See Holmes*, 670 F.3d at 591 ("At no time did Holmes ask for the interview to end or indicate that he was tired, desired a break, or otherwise was unwilling to proceed."); *Cristobal*, 293 F.3d at 141 ("Cristobal never requested not to be interviewed due to pain."); *United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997) ("Claude was in pain during his interview and having trouble breathing. However, he never requested that either of his two interviews stop due to pain."). Ultimately, the voluntariness of a waiver depends on "the absence of police overreaching, not on 'free choice' in any broader sense of the word." *Walker*, 607 F. App'x at 255 (quoting *Connelly*, 479 U.S. at 170); *Cristobal*, 293 F.3d at 141. Here, the record is devoid of any evidence that the FBI Agents intimidated, coerced, or deceived Kokayi. *See Cristobal*, 293 F.3d at 139. That Kokayi felt a certain amount of internal pressure is understandable, given his just-recent, unforeseen arrest. However, as one court in this District has put it, "[p]sychological pressure 'emanating from sources other than official coercion,'

[] does not render a waiver involuntary." *United States v. Borohov*, No. 1:14-CR-206 (LO), 2015 WL 13446284, at *3 (E.D. Va. Jan. 9, 2015) (quoting *Connelly*, 479 U.S. at 170).

Kokayi next claims that because his "repeated pleas" to know the nature of the charges against him went unanswered, his subsequent waiver of rights was either involuntary or unknowing. Def. Mot. at 9. Relatedly, Kokayi alleges that despite his "recurrent requests," "the officers repeatedly refused to elaborate" on the nature of the charges. Def. Mot. at 9. As a preliminary matter, Kokayi's claim that his "repeated pleas" and "recurrent requests" to know the nature of the charges went unanswered is simply contradicted by the record. In fact, one of the first things Special Agent Brundage said to Kokayi, on page two of the transcript, went as follows: "I'm Mark Brundage. This is Sean Clark, he's my partner. We work cases involving crimes against children. *So, you, you were arrested today on a charge for attempting to entice a minor to engage in sexual activity*." Trans at 2 (emphasis added). Not long after, Kokayi stated, "So my house was raided because of me talking to a minor. Is that, is that what's happening?" Trans. at 5. As is evident, Kokayi was fully aware of the reasons for his arrest and the charges against him.[7]

Nonetheless, even if the Agents had, in fact, declined to answer Kokayi's questions about the nature of the charges, such a fact would hardly render his waiver unknowing and unintelligent. Kokayi's suggestions to the contrary have been squarely rejected by the Fourth Circuit. *See United States v. Clenney*, 631 F.3d 658, 668 (4th Cir. 2011) (*Miranda* "does not require that the suspect be informed of the charges against him . . . while it is true that the officers did not inform Clenney

---

[7] Additionally, Kokayi's claim to have repeatedly asked the Agents for more information about the charges, Deft. Mot. at 9 (characterizing his requests as "repeated" and "recurrent"), is also contradicted by the record. By the government's count, Kokayi arguably only asked the agents once for details as to the charges, and even this was likely done rhetorically. As Kokayi stated, "So my house was raided because of me talking to a minor. Is that, is that what's happening?" Trans. at 5. The roughly ten minute period from the Agents' introduction to Kokayi's waiver contains no direct request for information as to the charges. Trans 2-8.

of the charges against him, *Miranda* does not impose a duty on law enforcement to do so."); *see also Gatherum*, 338 F. App'x 271 at 278 (rejecting argument that failure to inform defendant about outstanding arrest warrants rendered *Miranda* waiver involuntary and unknowing); *United States v. Bird*, 409 F. App'x 681, 684 (4th Cir. 2011) (an agent's response to a defendant's question that he would "have to wait and see" was "inconclusive and did not impair [the defendant's] capacity" to voluntarily waive *Miranda* rights).[8]  Indeed, the agents acted prudently in declining to engage in a detailed, pre-waiver discussion of the specific charges at issue given the risk that such a discussion could prompt the defendant to make an un-*Mirandized*, inculpatory (or false exculpatory) statement.

Kokayi's third argument is that his alleged lack of knowledge as to the process regarding requesting an attorney and his ability to withdraw his waiver once he began speaking rendered his waiver of rights involuntary or unknowing.  Def. Mot. at 9.  Once again, the recorded transcript contradicts Kokayi's assertions.  Kokayi was told numerous times that if he waived his rights, he could still stop the interview at any time.  Trans. at 4, 6-8.  This fact, which even Kokayi acknowledges, Def. Mot. at 11, points in favor of voluntariness.  *See United States v. Olmstead*, 698 F.2d 224, 227 (4th Cir. 1983) (defendant knew that he could refuse to make any statements and that he could terminate the interview at any time).  When Kokayi asked Special Agent Clark

---

[8] Over two decades before the Fourth Circuit decided *Clenney*, the Supreme Court stated that

> a valid waiver does not require that an individual be informed of all information useful in making his decision or all information that might affect his decision to confess.  We have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.  Here, the additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature.

*Spring*, 479 U.S. at 576-77 (citations, internal quotation marks and alterations omitted).

what would happen if he requested a lawyer, he was told "*Then we don't ask you any questions*." Trans. at 6 (emphasis added).  Special Agent Clark then proceeded to describe the overall Initial Appearance process as follows:

> And then at 2 o'clock you'll go to court, and probably between 2 and 3:30, I think, today you'll be appointed a lawyer.  And basically in court you'll be read, you'll be read the reason why you're being detained or arrested.  Your charges.  And then you'll have time to meet with the lawyer and whether you retain him or not is up to you.  The court, the court will appoint you a lawyer today, if you don't have the financial means.

Trans. at 6.  Special Agent Clark's fulsome explication of the Initial Appearance process clearly contradicts Kokayi's claim that he was left in the dark about the attorney-retention process. Moreover, Kokayi never asked for any clarification regarding requesting an attorney. Nevertheless, "it is not necessary that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege."  *Dire*, 680 F.3d at 475 (affirming validity of *Miranda* waiver despite acknowledging that the defendants "may not have grasped the nature and processes of the United States judicial system" because there was "no indication that the defendants did not understand the concept of an attorney, which is not a foreign [concept in Somalia].") (internal quotations and citation omitted); *see also id.* ("although Defendants may have a hard time understanding the notion of individual rights such as those guaranteed by the Fifth Amendment, that does not mean that they could not have or did not understand their options upon Special Agent Knox's recitation of the *Miranda* warnings"); *Robinson*, 404 F.3d at 860-61 (finding waiver valid despite defendant testifying at suppression hearing that that he "didn't know what that stuff [*Miranda* waiver] means . . . [because] [he had] never been through it before.") (second and third alterations in original); *Khoa Dang Hoang*, 737 F. App'x at 138-39 (rejecting argument that *Miranda* waiver was not knowing and intelligent because defendant had never been arrested before and feigned a lack of sophistication and familiarity with the American justice system).

15

Finally, Kokayi's fourth claim is that his two periods of silence, indicative of, according to Kokayi, "extreme hesitation and confusion," Def. Mot. at 9, are evidence that his waiver of rights was involuntary and unknowing.  Rather than indicating "extreme hesitation and confusion," Kokayi's moments of silence might equally be suggestive of his deliberate consideration of the important issue at hand.  *Cf. Bone v. Polk*, 441 F. App'x 193, 197 (4th Cir. 2011) (mere fact that defendant initially refused to sign a waiver form does not render his subsequent waiver involuntary).  In fact, the video-recorded interview shows no indication of such "extreme hesitation and confusion."  Rather, the video indicates that during these moments of silence, Kokayi sat pensively, doing very little other than occasionally scratching his head, as if deep in thought. Video Recording at 7:08-8:01, 9:25-9:54.  This is hardly the behavior of a man in the throes of "extreme confusion."  Nevertheless, the existence of self-imposed pauses, or moments of silence during an interrogation cannot be proof of involuntariness because they are not evidence of official action, let alone coercion.  *See Cristobal*, 293 F.3d at 139-41.  Because "[c]oercive police activity is a necessary finding for [] a *Miranda* waiver to be considered involuntary," *United States v. Giddins*, 858 F.3d 870, 883 (4th Cir. 2017), a suspects' self-imposed pauses simply do not count.

While Kokayi claims that his pauses were interrupted by the Agents' purportedly coercive statements and actions, Def. Mot. at 9, 11, nothing could be farther from the truth.  Although Special Agent Clark did interrupt Kokayi's two pauses, nothing in the video-recorded interview indicates that these interruptions took the form of coercion.  *See* Video Recording at 8:01, 9:52 (capturing the exact moments Special Agent Clark interrupted Kokayi's silence).  Moreover, Kokayi appeared unbothered when Special Agent Clark eventually broke the silence, and never once asked for more time to quietly deliberate.  Finally, that Special Agent Clark interrupted Kokayi to truthfully state that they could begin the interview if he signed the waiver form, Trans.

at 7-8, is no less than he was entitled to say under the circumstances.  *See United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987) ("a law enforcement officer may properly tell the truth to the accused.") (quotation marks and citation omitted).  While it is true that Kokayi was considering an important life decision, Special Agent Clark's accurate and truthful statements, even if cast as encouragement, do not rise to the level of coercion.  *Holmes*, 670 F.3d at 592 ("statements by law enforcement officers that are merely 'uncomfortable' or create a 'predicament' for a defendant are not ipso facto coercive."); *Pelton*, 835 F.2d at 1073 ("Truthful statements about Pelton's predicament are not the type of 'coercion' that threatens to render a statement involuntary."); *cf. United States v. Whitfield*, 695 F.3d 288, 302 (4th Cir. 2012) (agents' statement constituted the type of permissible, "vague, nondescript encouragement [that] did not misrepresent the legal effect of confessing.").

## II.   THE DEFENDANT'S *MIRANDA* WAIVER WAS VOLUNTARY AND NOT COERCED.

### A.  Legal Standard

The sole focus of the "voluntariness" inquiry is whether the defendant's statement was the product of government coercion.  *Connelly*, 479 U.S. at 169-70.  In considering whether a defendant's statement is voluntary, courts consider whether it was "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence."  *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (internal quotation marks omitted).  Even where "threats, violence, implied promises, improper influence, or other coercive police activity" exist, a statement is not necessarily rendered involuntary.  *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc).  "The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired."  *Id.* (internal quotation marks omitted).  "Before a confession may be found involuntary and inadmissible, there

must be evidence of coercive police activity even though the confession was prompted by a mental or emotional condition and was not the product of a rational mind and free will." *United States v. McCray*, 928 F.2d 400, at *2 (4th Cir. 1991) (unpublished) (quoting *Connelly*, 479 U.S. at 165-67).

In considering the voluntariness of a statement, courts consider "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Braxton*, 112 F.3d at 781 (internal quotation marks omitted). To find police action oppressive, there must be a "substantial element of coercive police conduct." *Connelly*, 479 U.S. at 163-64. "Absent police conduct causally related to the [statement], there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Id.*; *see also Giddins*, 858 F.3d at 883. Finally, "the voluntariness of a confession cannot be equated to the absolute absence of intimidation, for under such a test, virtually no statement would be voluntary because very few people give incriminating statements in the absence of official action of some kind[.]" *United States v. Wertz*, 625 F.2d 1128, 1134 (4th Cir. 1980) (internal citations and quotations omitted).

**B. Application**

In addition to the arguments concerning the *Miranda* waiver addressed above, Kokayi also appears to allege that his waiver of rights was obtained involuntarily and in contravention of Due Process.[9] According to Kokayi, it is "clearly establish[ed]" that he was "subjected to direct and implied promises, along with the exertion of improper influence . . . [and] that during the course of the interrogation deliberation period, his capacity for self-determination was critically

---

[9] Although Kokayi's argument is not entirely clear, he appears to argue that the waiver of rights itself was obtained involuntarily and through coercion, and not that any particular statements were the result of the Agents' purported coercion.

impaired." Def. Mot. at 11. These sweeping claims occupy less than one full page of Kokayi's Motion to Suppress. Def. Mot. at 11-12. The sole fact offered in support of these assertions is the Agents' alleged withholding of information concerning the nature of the charges. This, according to Kokayi, "was clearly the most debilitating aspect" of the interview. Def. Mot. at 12. As noted previously, Kokayi's claim is contradicted by the record, which clearly shows Special Agent Brundage introducing himself at the very beginning of the interview and stating that: "We work cases involving crimes against children. So, you, you were arrested today on a charge for attempting to entice a minor to engage in sexual activity." Trans at 2.[10]

Notwithstanding Kokayi's failure to support his far-reaching allegations, the totality of the circumstances clearly contradicts Kokayi's claim that his waiver was obtained in violation of Due Process. *See Braxton*, 112 F.3d at 781. As already explained, Kokayi is a 29-year-old English speaker with a Bachelor's degree in Computer Science and employed as a Content Developer. Trans. at 32. Kokayi volunteers as a Quran instructor on weekends, where he manages approximately fifty students of all ages. Trans. at 10, 32, 44. Prior to the interview, Kokayi received water, hot chocolate, a sandwich, and was told to feel free to eat, ask questions, and go to the restroom at any time. Trans. at 2-3. Kokayi was interviewed without handcuffs in a spacious, well-lit room and appeared alert, healthy, and fully lucid. The Agents spoke to Kokayi softly and engaged with him patiently. The Agents never displayed their weapons and never raised their voices or made threatening gestures. The atmosphere in which Kokayi spoke was far from hostile and any claim to the contrary is contradicted by the entirety of the video recording. *See United States v. Rosen*, 474 F. Supp. 2d 799, 802 (E.D. Va. 2007) ("Here, all the circumstances

---

[10] Even if Agent Brundage had *not* informed Kokayi of the nature of the charges, this fact alone would not render Kokayi's statements involuntary. *See Olmstead*, 698 F.2d at 226 (rejecting claim that agents' allegedly duplicitous silence as to nature of investigation was sufficient to render interview statements involuntary).

accompanying the alleged deceit compel the conclusion that all of the statements were voluntary. Defendants are well-educated and were aware of their rights . . . The agents made no threats or promises to defendants. There is no allegation the agents were hostile or intimidating during the telephone calls or interviews.").

Because Kokayi does not specify the "direct and implied promises" or "exertion[s] of improper influence" under which he allegedly labored, Def. Mot. at 11, the government is left to speculate. Nonetheless, and without conceding this occurred, the Fourth Circuit has held that government agents may "make and breach certain promises without rendering a resulting confession involuntary," *United States v. Shears*, 762 F.2d 397, 401-02 (4th Cir. 1985), and that an agents' "misrepresentations are insufficient, in and of themselves, to render a confession involuntary," *Whitfield*, 695 F.3d at 302 (citation omitted); *see also Johnson v. Harkleroad*, 104 F. App'x. 858, 864 n.3 (4th Cir. 2004) ("police may engage in some misrepresentation without rendering a suspect's resulting confession involuntary or coerced.") (citing cases); *United States v. Haynes*, 26 F. App'x. 123, 134 (4th Cir. 2001) (finding a confession voluntary where police staged a room to give the impression that a "massive investigation" of the defendant for murder was ongoing, though the defendant had been arrested on drug charges).

In any event, nothing of the sort occurred here. Because the record contains no evidence of "coercive police activity," *Connelly*, 479 U.S. at 167, there can be no Due Process violation, *id.* ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause"); *see also United States v. Amri*, No. 1:17-CR-50 (LMB), 2017 WL 3262254 (E.D. Va. July 31, 2017) ("'[c]oercive police activity is a necessary finding for' incriminating statements 'to be considered involuntary.'"), *aff'd sub nom. United States v. Queen*, 738 F. App'x 794 (4th Cir. 2018) (quoting *Giddins*, 858 F.3d at 881). Other than

speculating as to the effect of several innocuous occurrences during the interview, Kokayi fails to support the claim that his will was "overborne" "or his capacity for self-determination critically impaired." *Braxton*, 112 F.3d at 780.  For these reasons, Kokayi cannot show involuntariness under the Fifth Amendment's Due Process Clause.

## CONCLUSION

For the foregoing reasons the Defendant's arguments are without merit and his motion to suppress should be denied in its entirety.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By:           /s/
       Kellen S. Dwyer
       Dennis M. Fitzpatrick
       Assistant United States Attorneys
       Office of the United States Attorney
       2100 Jamieson Avenue
       Alexandria, VA 22314
       Phone: 703-299-3700
       Kellen.Dwyer@usdoj.gov

       Joseph Attias
       Trial Attorney
       U.S. Department of Justice
       950 Pennsylvania Avenue, NW
       Washington, DC 20530
       Phone: 202-616-0736
       Joseph.Attias@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 02, 2019, I filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send an electronic copy to all counsel of

record in this matter.

By:            /s/            
Kellen S. Dwyer
Assistant United States Attorney
Eastern District of Virginia
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: 703-299-3700