IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cr-410 |
| | ) | |
| SEITU SULAYMAN KOKAYI, | ) | Trial Date: April 8, 2019 |
| | ) | |
| Defendant. | ) | The Honorable Leonie M. Brinkema |

## **TRIAL BRIEF ON BEHALF OF SEITU SULAYMAN KOKAYI**

Seitu Sulayman Kokayi is charged with two counts of Coercion and Enticement of a Minor (18 U.S.C. §2422 (B)), and one count of Transfer of Obscene Material to a Minor (18 U.S.C. §1470). The following is submitted to assist the Court.

## **I. FACTS**

The defense has not stipulated to the admission of the audio and/or written transcripts that are offered by the government as evidence in this case. As articulated in open court, and as argued in its prior motion to suppress, the defense objects to this evidence as being unconstitutionally obtained. The government and Court have ostensibly obtained full knowledge of the basis on which, and manner in which this information was obtained. Still, the defense has not been provided with any of that information, and maintains its position in opposition.

Without waiving this objection, and assuming, *arguendo*, that this evidence is admitted, the government has proposed as an exhibit a chart with all of the alleged phone contact (via text

1

messages, telephone calls and Facetime) between Seitu Sulayman Kokayi (hereinafter "Sulayman" or "defendant") and MFV (counsel will use the same designation the government used to identify the alleged victim in the case). Based on the nature of this case, the history of the relationship between Sulayman and MFV, the inaccurate allegation that Sulayman chose MFV as a target and/or was "grooming" her for sexual conduct, the phone call evidence needs to be *considered in its entirety*.

In its trial brief and the expected evidence, the government has picked out a handful of passages from a handful of conversations between Sulayman and MFV, and has not accurately characterized their relationship. This involved a longer term, and substantial relationship that ultimately developed into an emotional relationship.

The relationship started as student/religious instructor relationship, but began to evolve into something more significant. As articulated by Special Agent Sean Clark, and acknowledged by Sulayman "[h]ow like a man and a woman, or someone who loves each other or just cares for each other has that emotional connection." (GX 56; with transcript, at page 14). The shift in the dynamic between MFV and Sulayman was seemingly precipitated by the disclosure that MFV had a crush on him (see GX 29). At that time, MFV was a post-pubescent, physically mature young woman, and Sulayman was unaware of her actual age (at times, MFV indicated to Sulayman directly that she was anywhere from 16-18 years old) (see GX 22; GX 29; GX 34; GX 56). In addition, the conversations that took place regarding the deepening of the feelings between the two took place when MFV was not in the Washington DC area.

Focusing on the time period highlighted in the government's case (August 3 – August 23), as noted by the government, there were many contacts (most of which were telephone calls) between Sulayman and MFV (GX 75). That contact was initiated by both Sulayman and MFV

2

at different times, and MFV, at times, exhibited frustration and impatience when Sulayman did not immediately answer her calls. (see GX 22). The government noted that the segmented total time of the telephone calls amounts to over 32 hours. Upon information and belief, the highlighted segment of calls offered by the government as separate exhibits to support their allegations amounts to somewhere between 1-2 hours. The remaining 30 to 31 hours of the calls represents meandering, patient, and supportive conversation between friends. The conversations at times drifted into topics such as light-hearted extended exchanges of answering yes/no to each other (see GX 44), light-hearted extended exchanges of saying hello repeatedly to each other (see GX 38), extended time discussing likes and dislikes in general (see GX 32; GX 40), an approximate ten minute segment during which Sulayman deeply confided in MFV about the difficulties he had growing up when his father abandoned him (see GX 44) and sharing a video game challenge (see GX 22; GX 80) among other non-specific and seemingly idle banter. Many of the conversations take place while either or both of them are performing tasks, such as cleaning (GX 40) or baking (recorded conversation from August 7, 2018, transcript p. 1) or cooking (see GX 80).

  The phone calls during this time period were made while MFV was staying with her family in the Midwest. She and her sister were visiting and staying with her Aunt, Uncle and three cousins (much younger). There were no calls made while MFV was alone in the house (which had seven people staying in it). During many of the phone calls, MFV had Sulayman on speaker phone (see GX 22). Also during most of the phone calls, there are many occasions where background noise and chatter is audible, and when other people, including MFV's older sister are featured and join in on the conversations (GX 77). There are a few examples from the government's highlighted excerpt exhibits during which Sulayman and MFV are speaking in

3

subdued, and at times whispered tones, due to the fact others (particularly MFV's younger cousins) in the house are sleeping. During one of those conversations, MFV acknowledges that a baby wakes up (GX44; 8/19/18; transcript at p. 4).

The narrative created by the government that this is a case of someone picking out a victim and "grooming" her is completely unsupported by the facts. The relationship did begin with Sulayman as a teacher. As noted, MFV was practicing Quran with him 5-6 years ago, went to a different location to do the same thing, then came back to Sulayman's Masjid about a year ago.

There were no indications of any "grooming." Sulayman had known MFV for a significant period of time, and just became closer to her after finding out she had a crush on him. Sulayman indicated that he had not been planning this relationship. (GX 56; transcript p. 37). It is important to note that Sulayman had been under extraordinarily close government scrutiny and surveillance for a significant period of time. Although the exact length of the government's surveillance is not known to the defendant, it is believed to have lasted for more than two years.

During the government's surveillance and subsequent investigation of Sulayman, the government has not only had access to all his communications, it has had access to basically his entire personal history, particularly the last several years. The government has had an opportunity to review all of his social media postings, emails, and text messages, as well as examine the contents of his computers, phone, and "cloud" storage. Outside of the allegations of the present charge, there is no indication anywhere that Sulayman possessed any inappropriate or illegal materials (such as child pornography), or exhibited any conduct consistent with what is alleged. In addition, Sulayman and MFV never exchanged nude photos, and Sulayman never asked or pestered MFV for nude photos. Moreover, there is absolutely no history of any

4

inappropriate conduct involving any other underage, or even adult, females. Sulayman did not spend time in internet "chat" rooms looking for young girls. There is, however, every indication that the emotional connection experienced and displayed between Sulayman and MFV in this case was unique, and aberrational. And that the connection was a genuine emotional connection, albeit inappropriate.

The masjid at which Sulayman was an instructor involved a class of approximately 50 students who he taught twice per week (GX 56; transcript at p. 32). The students' ages ranged from 5-18 years old (see GX 56; transcript at p. 12), and Sulayman had "a relationship with pretty much everyone in the class." (*Id.* p. 12). In addition, FaceTime communication with the students was normal, to ensure that the students were reciting passages from memory, and not simply reading passages from the Quran.

It is admitted by the defense, as it was admitted by Sulayman himself during his interrogation, it was a mistake "in talking to her in the first place. And then, just like conversations I shouldn't have had, like, since I'm married too and, like, I'm the teacher. I teach certain people to do things so I shouldn't be doing stuff myself . . . I was, that's being hypocritical" (GX 56; transcript at p. 25-26). It is admitted and acknowledged that the emotional connection and communications that took place were inappropriate and improper, given the ages of Sulayman and MFV. However, the Defendant's conduct did not violate the law as alleged by the government. In fact, Sulayman told MFV "we'll just have to find out how it goes once we get back, but I feel like we need to be careful around each other, OK?" (GX 29).

Although, at times, the two would contemplate meeting when she returned to her home, these discussions were hypothetical, and were typically addressing sometime in the future, even for periods of years. There was never any planned date, place or manner to meet. Thoughts and

5

ideas were discussed, with no real intention on following through. At times the defendant stated that physical interactions could not and should not happen.

Examples of this include:

"K: No, I said, do you want stuff- you should think about, let's say, stuff happening with the person you like? Right? But then I said, it shouldn't unless obviously like, you're married, whatever. Right? But then I said, well, it can happen in your dreams, and that's what dreams are for.
(GX29; 8/9/18; transcript p. 10)

"K: I said, 'Maybe I won't, I will be able to see you but I said you probably won't be able to get out of the house.'
MFV: True.
K: Uhh. The waiting game is always there."
(GX34; 8/11/18; transcript p. 16)

MFV: No, I said, 'I'll be a constant reminder of your suffering.
"K: Oh, I know. Well, I'm the same for you so, touche'."
(GX33; 8/11/18; transcript p. 13)

"K: Look, I'm saying, have you thought about us in the future?"
(GX44; 8/19/18; transcript p. 44)

"K: When you're home will you actually be able to talk to me?"
(GX52; 8/22/18; transcript p. 15)

In fact, during his interview with the FBI, the defendant told the agents that he was contemplating stopping all communication with MFV. (GX56)

It should be noted that not all of the sexually related conversations were initiated by Sulayman. At times, MFV would initiate the sexual related talk, and would be flirtatious and use sexual innuendo. These include:

"MFV: I said at first, like I was saying, like, the first time I think I had a crush on you right [UI] . . . I thought it would be easy.
K: Yeah.
MFV: I was like, oh I'll probably get over it, I don't know him that much. [UI]
(GX29; 8/9/18; transcript at p.1)

"K: What the- , I'm coming.

6

MFV: How fast [laughing]
K: Mmm. It might take all night, but that's ok.
MFV: Ohh. Okay.
K: Yeah?
MFV: Said okay.
K: It would be an amazing surprise, huh?
MFV: And a painful one.
K: Why?
MFV: You don't get it, but it's okay. [laughing]
K: [laughing] Oh, my God."
(GX40; 8/15/18; transcript at p.6)

"K: Don't make me come through this stupid phone.
MFV: Please don't.
K: Why?
MFV: I don't want to get my phone um covered in slime [laughing].
K: Oh you got jokes?
MFV: [laughing] [sigh]."
(GX44; 8/19/18; transcript at p. 15)

MFV: [laughing] You're cute as fuck though.
K: [whispering] What'd you say?
MFV: I said, "you're cute as fuck."
(GX44; 8/19/18; transcript at p. 42)

## II. ANALYSIS

### 1. Counts One and Two

The first two counts of the indictment allege a violation of 18 U.S.C. §2422(b). This statutory section is contained within Chapter 117 of the United States Code, entitled "TRANSPORTATION FOR ILLEGAL SEXUAL ACTIVITY AND RELATED CRIMES." The language of §2422(b) provides that "[whoever, **using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States** knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title

and imprisoned not less than 10 years or for life." This subsection differs from subsection (a) of §2422 in that it requires a mandatory minimum sentence of 10 years, yet the only difference in the language of the two subsections is that indicated above in bold. Thus, using a "means of interstate or foreign commerce" elevates the exact same underlying conduct to a ten year mandatory minimum. As the Court is aware, the case law interpreting the statute has provided that the use of a cell phone or the internet can be a means of interstate or foreign commerce.

The construction of these code sections has led to inconsistency of interpretation concerning the case law relating to them. The statute has an organic attempt provision, and references the violation of "any law." The attempt aspect will be addressed below. Nonetheless, "any law" has been interpreted to mean any federal or state law of an appropriate venue wherein a defendant could have been charged with a sexual offense. *United States v. Dingra*, 371 F. 3d 557 (9th Cir. 2004). Still, common sense review of the statute, and the case law interpreting it, provides the notion that often times the statute criminalizes and punishes much more severely, conduct which is also punishable by state law.

   A. <u>Persuade, Induce, and Entice</u>

As the Alexandria Division of the Eastern District of Virginia has stated, "the statute's primary focus is on adults using the Internet to seek out and persuade minors to meet for the purpose of engaging in sexual activity." *United States v. Kaye*, 451 F. Supp. 2d 775, 781 (2006) (affirmed by *United States v. Kaye*, 243 Fed. Appx. 763(4th Cir. 2007)). To convict under § 2422(b), the Government must prove the following elements beyond a reasonable doubt: (1) use of a facility of interstate commerce; (2) to knowingly persuade, induce, entice, or coerce; (3) a

person who is younger than eighteen; (4) to engage in an illegal sexual activity. *See United States v. Helder,* 452 F.3d 751, 755 (8th Cir. 2006) (citations omitted).

Although the terms "persuade," "induce," and "entice" are not statutorily defined, we have found that they are "words of common usage" and have "accord[ed] them their ordinary meaning." *United States v. Engle*, 676 F.3d 405, 411 n.3 (4th Cir. 2012). Moreover, these terms are "effectively synonymous," conveying the idea "of one person leading or moving another by persuasion or influence, as to some action [or] state of mind." Id. (alteration in original) (internal quotation marks omitted). *United States v. Clarke*, 842 F.3d 288, 296. In addition, "by emphasizing that the jury must find that Defendant "le[d] or mov[ed] [a minor] by persuasion or influence" to engage in sex acts, the district court's jury instructions required the jury to find that Defendant made "an effort to alter [a minor's] mental state," rather than "merely convey[ing] the notion of 'causation … .'" *Id.*

Looking at the facts of this case, Sulayman was not "using the Internet to seek out and persuade minors to meet for the purpose of engaging in sexual activity." Rather he was using his iPhone to communicate with a young woman he had known for years (MFV), using normal phone lines, and other apps that he had been using to communicate with her for years. MFV had already expressed an interest in Sulayman, and did not need to be led or moved to a state of mind by Sulayman. The conversations between the two were genuine and organic, and evolved into conversations with portions having a sexual nature. In addition, some of the sexual talk was initiated by MFV. Finally, even after the sexual talk became part of the conversations, the other aspects of the conversations persisted; the purpose of the conversation was not to just to speak about sex. Accordingly, the evidence will not be enough to prove beyond a reasonable doubt

that Sulayman persuaded, induced, or enticed MFV to engage an illegal sexual activity, as those words have been interpreted by the case law.

### B. Substantial Step Or Significant Conduct

Next, with regard to the attempt provision of §2422(b), "in order to convict a defendant of attempt, the government must prove beyond a reasonable doubt, that (1) [the defendant] had culpable intent to commit the crime and (2) he took a substantial step towards completion of the crime that strongly corroborates that intent." *United States v. Engle*, 676 F.3d 405, 419-20 (4th Cir. 2012) (citing *United States v. Neal*, 78 F. 3d 901, 906 (4th Cir. 1996)). With regard to the particular type of attempt in this statute, The *Engle* opinion notes "'[a]n attempt to commit a crime, which is recognized as a crime distinct from the crime intended by the attempt, punishes conduct that puts in motion events that would, from the defendant's point of view, result in the commission of a crime but for some intervening circumstance.'" (citing *United States v. Pratt*, 351 F. 3d 131, 135 (4th Cir. 2003)). In addition, "[t]he 'mere intent to violate a federal criminal statute is not punishable as an attempt unless it is also accompanied by significant conduct.'" (citing *United Staes v. Resendiz-Ponse*, 549 U.S. 102, 107 (2007)). *Engle*, 676 F.3d at 419.

Put another way, the Government must also prove that Defendant: (1) acted with the kind of culpability required for a conviction of the underlying substantive offense; (2) engaged in conduct that constitutes a substantial step toward commission of the crime. *United States v. Kaye*, 451 F. Supp. 2d 775, 782 (2006) (*affirmed by United States v. Kaye*, 243 Fed. Appx. 763(4th Cir. 2007)) (citing *United States v. Farner,* 251 F.3d 510, 513 (5th Cir. 2001); *United States v. Helder,* 452 F.3d at 755 (8th Cir. 2006)).

Moreover, the *Engle* Court stated, "[f]or purposes of the crime of attempt, a substantial step is a direct act in a course of conduct planned to culminate in commission of a crime that is strongly corroborative of the defendant's criminal purpose. It is more than mere preparation but less . . . than completion of the crime. Whether conduct represents a substantial step depends on the 'surrounding factual circumstances; and the determination is necessarily fact specific." *Engle* at 423 (internal citations and quotes omitted).

Hence, one final inquiry under the statute is whether Defendant's conduct constitutes a "substantial step" toward the commission of the crime. Pursuant to *Kaye*, *"*[t]his element is satisfied by actual, objective acts that, independent of Defendant's mental state, strongly corroborate and provide unequivocal evidence of his culpability. *Kaye*, 451 F. Supp. 2d at 787 (citing *United States v. Root*, 296 F.3d 1222, 1228 (11th Cir. 2008)). Moreover, "[a]lthough 'words and discussions would usually be considered preparations for most crimes, a specific discussion could be so final in nature that it left little doubt that a crime was intended and would be committed." Engle, 676 F.3d at 423 (citing *United States v. Pratt*, 351 F. 3d 131, 136 (2003)).

Finally, courts are to consider the "totality of [the defendant's] conduct to determine whether the record supports a finding that he "committed a substantial step" toward persuading or enticing a minor to engage in a sex act. " *United States v. Lee*, 603 F.3d 904, 916 (11th Cir.2010); *United States v. Yost*, 479 F.3d 815, 820 (11th Cir. 2007).

In the present case, there was no substantial step or significant conduct that accompanied the sexual talk. No solid plan was ever expressed or agreed upon to meet for sexual acts and/or intercourse to be performed. The defendant did not travel to where MFV was contemporaneously with on-going conversations. And to the extent there were discussions that included what it might be like to follow through with any meeting, there were also discussions as to why they

11

should not follow through. In addition, to the extent the government takes the position that the FaceTiming in the shower is a substantial step, it is noted that MFV corroborates only one such session, where nothing sexual was requested of MFV or shown by MFV. Moreover, regarding any requests by Sulayman to MFV to masturbate, there will be no evidence that he asked her to stream it to him on FaceTime. Based on the totality of the circumstances, including all of the non-sexual conduct, it cannot be concluded that any substantial step or significant conduct occurred that would rise to the level necessary for a conviction beyond a reasonable doubt.

### C. Underlying Illegal Sex Act

Finally, it is important to note that the elements of the underlying illegal sex act, or "sexual activity" as its referred to in the statute, must be proven. *See, e.g., United States v. Kaye* 451 F. Supp. 2d at 782 ("the Government must also prove that Defendant: (1) acted with the kind of culpability required for a conviction of the underlying substantive offense… ."). Hence, the government must provide evidence that the defendant attempted to entice MFV to engage in acts that would have led to a conviction under the state and/or Federal statutes relating to the alleged sexual activity.

Accordingly, for Count One, the government will need to further prove a violation of 18 U.S.C. § 2251, Virginia Code §18.2-374.1, and Minnesota Statutes, §617.246 (all relating to the production of child pornography).

As for Count Two, assuming, *arguendo*, that the government can establish the appropriate jurisdictional requirements for Washington D.C. and Maryland, the government will further need to prove a violation of Virginia Code §18.2-371, Code of the District of Columbia,

section 22-3008, and Code of Maryland, criminal law, section 3-307(A)(4) and (5) (all relating to adult engaging in sexual acts with a minor, of various ages depending the particular statute).

Moreover, for each of Count one and Count two, the substantial step or significant conduct that the government attempts to prove necessarily must relate to the underlying criminal sexual acts defined for each of the counts.

**2. Count Three**

Under Count Three of the indictment, the government must prove that Sulayman "using the mail or any facility or means of interstate or foreign commerce, knowingly transfer[ed] obscene matter to another individual who has not attained the age of 16 years, *knowing* that such other individual has not attained the age of 16 years, or attempt[ed] to do so … ." 18 U.S.C. § 1470 (emphasis added). Accordingly, under this statute, a defendant must have actual knowledge that the recipient of the material has not obtained the age of 16 at the time the material was transmitted.

As the facts of this case show, there were many discrepancies concerning how MFV portrayed her age to Sulayman. Even during the FBI interview, Sulayman maintained that he was unaware of MFV's actual age, and the agents conducting the interview seemingly concurred with the notion that there was a range of potential ages, and were trying to make sure that those ranges were under 18 years old. Moreover, during the phone conversations when MFV talks about her age, she leaves it ambiguous, with and on at least one or two occasions indicates an age over 16 years to Sulayman. Accordingly, the government will not be able to prove beyond a reasonable doubt that the defendant had actual knowledge that MFV had not attained the age of 16 years.

In addition, there will be no evidence to definitively establish what images were transferred, if any, via Face Time. Thus, it is impossible to undertake the analysis pursuant to *Miller*, as espoused by the government.

### III. Conclusion

For the reasons discussed above, it is respectfully submitted that the government will be unable to meet its burden to prove the allegations set forth in the indictment beyond a reasonable dount.

Respectfully submitted,

SEITU SULAYMAN KOKAYI
By Counsel

_____/s/_____
Mark Petrovich
Va. Bar # 36255
Petrovich & Walsh, P.L.C.
10605 Judicial Drive, Suite A-5
Fairfax, Virginia 22030
(703) 934-9191 (tel)
(703) 934-1004 (fax)
mp@pw-lawfirm.com (email)

Anthony Nourse, Esquire
Va. Bar # 40335
4151 Chain Bridge Road
Fairfax, Virginia 22030
(703) 881-9161
(703) 881-9162 (fax)
ahn@fairfaxdefense.com

**CERTIFICATE OF SERVICE**

I hereby certify that on or before the 7th day of April, 2019, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Kellen S. Dwyer, Esquire
Dennis M. Fitzpatrick, Esquire
Assistant United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
phone: 703 299-3816
fax:     703 299-3981
Kellen.Dwyer@usdoj.gov
Dennis.Fitzpatrick@usdoj.gov

_____/s/_____
Mark Petrovich
Virginia Bar No. 36255
Counsel for the Defendant
PETROVICH & WALSH, P.L.C.
10605 Judicial Drive, Suite A-5
Fairfax, Virginia 22030
Phone:  (703) 934-9191
Fax:  (703) 934-1004
mp@pw-lawfirm.com